IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**JOHN W. GOLD,**                                    Case No. 3:15 CV 2001

      Plaintiff,

      v.                                    Magistrate Judge James R. Knepp, II

**CITY OF SANDUSKY, et al.,**

      Defendants.                        MEMORANDUM OPINION AND ORDER

## INTRODUCTION

On September 25, 2015, John W. Gold ("Plaintiff") filed a Complaint against: (1) the City of Sandusky, John Orzech, Phil Frost, Officer Lester A. Peters, Officer Kyle Dumond, and Officer Mark Gilliam; (2) Firelands Regional Medical Center ("FRMC") and Thomas Manuguerra, R.N. ("Nurse Manuguerra"); and 3) ER DOC, Inc. and Patrick Tupa, D.O. ("Dr. Tupa"). (Doc. 1).[1] In the Complaint, Plaintiff alleged violations of 42 U.S.C. § 1983, the Ohio Constitution, and Ohio statutes. *Id.* Currently pending before the Court are Motions for Summary Judgment filed by all Defendants (Docs. 40, 54-55, 58), to which Plaintiff has filed a combined Opposition (Doc. 69), and Defendants have filed Replies (Docs. 71, 74, 75). Plaintiff also filed a Sur-Reply to the ER Doc Defendants Reply. (Doc. 77). For the reasons discussed below, the undersigned GRANTS Defendants motions for summary judgment as to Plaintiff's federal claims, and DISMISSES without prejudice Plaintiff's remaining state-law claims.

---

1. Firelands Regional Medical Center, Manuguerra, ER Doc., Inc., and Tupa may also be referred to collectively as the "Medical Provider Defendants".

This case arises from an interaction between Plaintiff and Defendants on the night of September 26, 2014 and the early morning of September 27, 2014. Viewing the facts in the light most favorable to Plaintiff, the background of this case is as follows:

The Accident

On the evening of September 26, 2014, Plaintiff crashed his car into a utility pole after consuming two or three Angry Orchards, each with a shot of Fireball whiskey. (Plaintiff Depo., Doc. 44, at 13-21)[2]. Plaintiff was distracted by his phone before the accident. *Id.* at 17, 21. The car was totaled. *Id.* at 25-26. After the accident, Plaintiff got out of his car, called his girlfriend, and began walking home. *Id.* at 26. He got a couple of blocks before the police arrived, in at least two cars. *Id.* at 30. Plaintiff recognized one of the officers as Mark Gilliam. *Id.* The other officer was Lester Peters. (Peters Depo., Doc. 46, at 8).

The officers handcuffed Plaintiff and took his wallet out of his back pocket. (Plaintiff Depo., Doc. 44, at 31). Officer Peters testified Plaintiff smelled of alcohol. (Peters Depo., Doc. 46, at 46). Plaintiff was not initially told why he was being arrested, but was later told he was being placed under arrest for operating a vehicle while impaired. (Plaintiff Depo., Doc. 44, at 32). The officers asked him to identify himself, but Plaintiff decided not to speak to them. *Id.* at 31, 38.

Officers Gillam and Peters transported Plaintiff to the scene of the crash in the back of a police car. *Id.* at 37; Peters Depo., Doc. 46, at 14. Officer Peters asked Plaintiff if he needed medical attention, but Plaintiff did not respond. (Peters Depo., Doc. 46, at 14). Officer Peters

---

2. All page citations reference the internal deposition page numbers, rather than the ECF page numbers. Moreover, for clarity, the undersigned references the full deposition transcripts which have been filed, rather than the excerpts attached by each party to their pleadings.

then called the Sandusky Fire Department paramedics to evaluate Plaintiff. *Id.* Officer Peters told the paramedics that Plaintiff had been involved in an accident, was not talking, and that Peters did not know if Plaintiff was injured. *Id.* at 20. The paramedics removed Plaintiff from the police car, placed him on a backboard, and loaded him in an ambulance. *Id.* Plaintiff resisted; he did not want to get into the ambulance, but his "priority was really just keeping [his] mouth shut" because he did not want to communicate with the police. (Plaintiff Depo., Doc. 44, at 38-39). While Plaintiff was in the back of the ambulance, Officer Peters read him a Form 2245, which explains the police want OVI suspects to submit to tests. (Peters Depo., Doc. 46, at 23). Plaintiff did not respond, so the form was marked as a refusal. *Id.* at 27, 43. Officer Dumond arrived when Plaintiff was in the ambulance. (Dumond Depo., Doc. 47, at 11).

At the Hospital

Paramedics transported Plaintiff to the hospital in the ambulance. (Peters Depo., Doc. 46, at 20). Officer Dumond walked to the hospital.   (Dumond Depo., Doc. 47, at 12). Officer Peters followed the ambulance to FRMC. (Peters Depo., Doc. 46, at 37). He spoke to the charge nurse and reported Plaintiff had been involved in a car accident and was not answering questions. *Id.* at 29. Officer Peters never asked anyone at FRMC to obtain blood or urine testing for alcohol content. *Id.* at 37-38, 49. Officer Peters stayed at the hospital for five to ten minutes. *Id.*at 28. Officer Dumond stayed after the other officers left. (Dumond Depo. Doc. 47, at 26-27). Dumond also testified he did not ask anyone at FRMC to obtain Plaintiff's blood alcohol level. *Id.* at 33-34.

The medical record reflects that Plaintiff arrived at the FRMC emergency department at 12:22 a.m. on September 27, 2014. (Manuguerra Depo., Doc. 45, at 31). The chief complaint recorded by Nurse Manuguerra was "trauma major", which he defined as "any trauma that is

potential[ly] life threatening." *Id.* at 32; *see also* Ex. A, Doc. 55-1, at 4 (emergency room report). Mr. Manuguerra made this assessment based on the report from the paramedics that Plaintiff's car had moved the telephone pole, and that he had a positive seat belt sign. (Manuguerra Depo., Doc. 45, at 32). A positive seatbelt sign is "redness from the shoulder that goes across down to the chest and the abdomen where your seat belt comes from." *Id.*; *see also id.* at 100. Mr. Manuguerra explained that a seat belt sign can be concerning for internal injuries. *Id.* at 100-01. He could not recall whether such a mark extended over Plaintiff's abdomen. *Id.* at 32-33. Dr. Tupa testified he would expect a nurse to document if such a mark extended over the abdomen. (Tupa Depo., Doc. 43, at 98-99).

Initial hospital notes indicate "Pt not refusing to answer any questions". (Plaintiff's Ex. 1 to Manuguerra Depo., Doc. 45, at 50). Plaintiff answered questions about his date of birth, social security number, and insurance. (Plaintiff Depo., Doc. 44, at 49). Plaintiff cooperated with Mr. Manuguerra to some degree, in terms of obtaining his vital signs. (Manuguerra Depo., Doc. 45, at 48-49). Hospital notes thereafter indicate Plaintiff refused to answer questions, and repeatedly stated he would not consent to medical care. (Plaintiff's Ex. 1 to Manuguerra Depo., Doc. 45, at 50-51). Notations of "in SPD custody" and "Police custody" appear in the hospital notes. (Exs. 2 & 4 to Tupa Depo., Doc. 43, at 46, 57.; Ex. 2 to Manuguerra Depo., Doc. 45, at 57). Mr. Manuguerra testified that he discussed with the police officers whether Plaintiff was "in custody", which he explained was relevant because: "If they want to leave, if the police can be there." (Manuguerra Depo., Doc. 45, at 38). He also testified that police custody does not bear on whether a patient can decline to be treated. *Id.*

Five minutes after his arrival in the emergency room, Dr. Tupa assessed Plaintiff. (Plaintiff's Ex. 1 to Manuguerra Depo., Doc. 45, at 50). Three minutes later, Dr. Tupa called a

"Trauma Standby". *Id.*; *see also* Doc. 55-1, at 1 (Dr. Tupa Affidavit). He did so due to the fact that Plaintiff had been in a motor vehicle accident. (Tupa Affidavit, Doc. 55-1, at 1). A trauma standby includes a series of tests including urinalysis, blood work, and radiology studies. *Id.* Plaintiff denied any symptoms of head, neck, or back pain to Dr. Tupa. (Plaintiff Depo., Doc. 44, at 40-41). Plaintiff testified he refused all treatment because he "felt it was invasive and [he] wasn't hurt". *Id.* at 41. Dr. Tupa ordered these tests to rule out "internal injuries to the head, traumatic brain injury, again the cervical spine, chest, abdomen, pelvis, the solid organs, the viscous organs, splenic laceration, kidney laceration, liver laceration and fractures." (Tupa Depo., Doc. 43, at 20).

Hospital notes from Mr. Manuguerra show at some point Plaintiff became uncooperative and belligerent, yelling and swearing at hospital staff. Ex. 1 to Manuguerra Depo., Doc. 44, at 50-51; *see also* Manuguerra Depo., Doc. 45, at 47-50. Plaintiff disagreed with a security guard's statement that he was "immediately belligerent", stating he later became hostile but "that was not the first thing that happened." (Plaintiff Depo., Doc. 44, at 49). Mr. Manuguerra testified that he made such notations in the record to document that Plaintiff was delaying care, something he believed could be dangerous to Plaintiff. (Manuguerra Depo., Doc. 45, at 44-45). These notations reflect Plaintiff repeatedly stated he did not consent to medical care. (Plaintiff's Ex. 1 to Manuguerra Depo., Doc. 45, at 50-51.

At some point, Plaintiff was told he could not refuse treatment because he was in police custody.

Q        Who told you that, by the way, if you remember today?

A        They were in scrubs, and the police officers also – there was at least one
         police officer that said that. And they said that multiple times. They said,
         "You're in police custody, you can't refuse."

(Plaintiff's Deposition, Doc. 44, at 50).

Dr. Tupa ultimately determined Plaintiff was not competent to refuse medical treatment. (Tupa Affidavit, Doc. 55-1, at 2). Therefore, he believed he had implied consent to treat Plaintiff for potentially life threatening injuries. *Id.*; Tupa Depo. Doc. 43, at 67.

Dr. Tupa testified that he ordered the testing he did to rule out life threatening injuries. (Tupa Depo., Doc. 43, at 20). Based on Plaintiff's behavior, Dr. Tupa was partially concerned about a traumatic brain injury. (Tupa Affidavit, Doc. 55-1, at 2). Dr. Tupa observed Plaintiff was visibly intoxicated, not behaving rationally, and was belligerent with medical staff. *Id.*

Ultimately, at Dr. Tupa's direction, Plaintiff was sedated so that medical tests could be performed. (Tupa Depo., Doc. 43, at 26); *see also* Manuguerra Depo., Doc. 45, at 54-55. This was done "with the assistance of security and Sandusky PD." (Ex. 1 to Manuguerra Depo., Doc. 45, at 51). Before the CT scan was performed, Plaintiff became agitated again and was re-medicated. *Id.* Plaintiff was accompanied by Sandusky police and security to the radiology department for his CT. *Id.*

The abdominal CT scan showed Plaintiff had a "big distended bladder". (Manuguerra Depo., Doc. 45, at 60). According to Mr. Manuguerra, Dr. Tupa was concerned about blood in the bladder. *Id.*; Tupa Affidavit, Doc. 55-1, at 2. Plaintiff testified he was never asked to provide a voluntary urine sample at the hospital. (Plaintiff Depo., Doc. 44, at 58). Dr. Tupa originally ordered a urinalysis at 12:33 a.m., the catheterization was not performed until 2:30 a.m. *See* Manuguerra Depo., Doc. 45, at 63. Mr. Manuguerra testified that "[s]ometimes the doctors don't like to put in a Foley cath if it isn't necessary at first just because there's all this risk for infection." *Id.* at 53. Mr. Manuguerra also testified he "remember[ed] Dr. Tupa being more adamant on the Foley after he saw the CT scan of his distended bladder." *Id.* at 88. Plaintiff also

testified Dr. Tupa informed him he intended to catheterize Plaintiff and he told Dr. Tupa he did not have permission to do so. *Id.* at 43-44. Dr. Tupa gave the order that a catheterization be performed to obtain a urine specimen. (Tupa Affidavit, Doc. 55-1, at 2). Mr. Manuguerra performed the catheterization at Dr. Tupa's order. (Tupa Affidavit, Doc. 55-1, at 2); *see also* Manuguerra Depo., Doc. 45, at 61. Plaintiff was heavily sedated at the time. (Manuguerra Depo., Doc. 45, at 86); *see also* Plaintiff's Depo., Doc. 44, at 42 ("I was out when I was catheterized, so I don't have any recollection of . . . having the Foley catheter inserted into my urethra."). Dr. Tupa testified that the purpose of the urinalysis is to ensure there is no blood in the urine to rule out kidney or urethra laceration, bladder or prostate injury, or pelvic fractures. (Tupa Depo., Doc. 43, at 29-30). He also explained "The urine drug screen is important if it is completely negative and somebody is acting strange or irrational. Then the concern would be for a traumatic brain injury." *Id.* at 30. Dr. Tupa testified the catheterization was medically necessary to evaluate his kidney, and the urine drug screen was important to evaluate his mental status. *Id.* at 95.

Officer Dumond testified he never instructed Dr. Tupa to catheterize Plaintiff. (Dumond Depo., Doc. 47, at 35). Officer Peters testified that he did not instruct medical staff to obtain either blood or urine. (Peters Depo., Doc. 46, at 49). Manuguerra testified that none of the officers ever instructed him to obtain blood or urine from Plaintiff. (Manuguerra Depo., Doc. 45, at 105). Dr. Tupa gave the order for the blood draw. *Id.* at 106. Dr. Tupa also asserts he ordered the catheterization and at no time did any police officer direct such a procedure. (Tupa Affidavit, Doc. 55-1, at 2); *see also* Tupa Depo., Doc. 43, at 95-96. Plaintiff testified he "believe[d] that there was a communication between the police officer and Dr. Tupa just prior to [his] being sedated the first time" . . . but that he did not "know what was said, but [he] [knew] that there was a communication between the two." (Plaintiff Depo., Doc. 44, at 9-10).

Plaintiff was ultimately discharged into police custody at 3:46 a.m. (Ex. 1 to Manuguerra Depo., Doc. 45, at 55).

Request for Records

On October 9, 2014, Officer Peters issued a subpoena to FRMC requesting "[a]ny and all medical records for John Gold . . . on September 27, 2014." (Peters Depo., Doc. 46, at 34). He testified that a subpoena was the standard method by which Sandusky Police obtain medical records to be used in a prosecution in OVI cases. *Id.* at 31. And, the use of a subpoena was consistent with the training he had from the Sandusky Police Department. *Id.* at 36.

On October 17, 2014, Assistant Chief Frost issued a second subpoena to FRMC requesting "[a]ny and all medical records for John Gold . . . for September 26, including BA results, and any attending physician or nurse's notes, and pictures." (Doc. 46, at 36). He did so at the request of the city prosecutor, and did not know a prior subpoena had been issued. (Frost Depo., Doc. 61-1, at 24).

There is no official written policy in the Sandusky Police Department regarding obtaining blood alcohol results or other medical records via subpoena, but several officers testified it was standard procedure. *See* Peters Depo. Doc. 46, at 34; Asst. Chief Frost Depo. Doc. 61-1, at 27; Officer Dumond Depo. Doc. 47, at 15-16; Chief Orzech Depo., Doc. 60-1, at 16, 21-23.

FRMC responded to both subpoenas. (Doc. 46, at 35, 37).

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. Further, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting that the court "need consider only the cited materials").

DISCUSSION

Plaintiff brings both federal and state law claims related to the September 2014 incident. He asserts violations 42 U.S.C. § 1983 based on: 1) his "Fourth, Fifth and Fourteenth Amendment right to be free from unreasonable search and seizure"; and 2) his "Fifth and Fourteenth Amendment rights against deprivation of property. (Doc. 1, at 6-7). Plaintiff also asserts a *Monell* claim under § 1983 against the City of Sandusky, asserting the City's policies or practices, and failure to train or monitor, violated the Constitution. *Id.* at 7-8. Finally, Plaintiff brings claims based on the Ohio Constitution and Ohio law (including "the torts of battery and invasion of privacy"). *Id.* at 7.

For the reasons discussed below, the undersigned GRANTS Defendants motions for summary judgment on the federal law issues. The undersigned declines to exercise jurisdiction over Plaintiff's remaining state law claims, and DISMISSES those claims without prejudice.

<u>42 U.S.C. § 1983</u>

In order to state a claim under § 1983, a plaintiff must allege both a violation of a right or rights secured by the Constitution or laws of the United States and that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42 (1988). A private entity or private individual acting on his or her own cannot deprive a citizen of his or her constitutional rights. *See Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978); *Hudgens v. NLRB*, 424 U.S. 507 (1976)). Section 1983 does not create a cause of action against a private actor "'no matter how discriminatory or wrongful' the party's conduct." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).

To satisfy the "color of state law" prong of § 1983, Plaintiff must provide facts showing that Defendants were either 1) acting under the compulsion of the state (state compulsion test); 2) engaged in an activity traditionally reserved to the state (public function test); or 3) their activities were sufficiently close and/or controlled by the state that their actions could fairly be attributed to it (nexus test). *See Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003).

### *Medical Provider Defendants*

The medical provider Defendants (Firelands, Nurse Manuguerra, Dr. Tupa, and ER Doc., Inc.) contend they cannot be held liable under § 1983 because they are not state actors. Plaintiff argues he can show a question of fact regarding state action. For the reasons discussed below, the undersigned finds the medical provider Defendants are entitled to summary judgment on Plaintiff's § 1983 claims.

The medical provider Defendants contend Plaintiff cannot satisfy the compulsion or nexus tests because he has not shown any evidence the medical providers were working at the

behest of the police officers. Plaintiff responds that "[t]here is some direct evidence that Mr. Gold was 'worked up' because he was in police custody, and a great deal of circumstantial evidence". (Doc. 69, at 45). In his Complaint, Plaintiff asserts: "At the FRMC ED, one or more of the arresting officers instructed the physicians and staff then working at FRMC ED to catheterize the Plaintiff, for the purpose of obtaining urine." (Doc. 1, at 5). Plaintiff seemingly presents two arguments – first, that the medical providers were state actors in obtaining urine and blood samples, and second, that the medical providers were state actors in releasing Plaintiff's records to the police.

*Fourth Amendment Claim*

In support of his first argument, Plaintiff points to: 1) his testimony that he was told couldn't refuse treatment because was in police custody, and 2) a notation regarding custody made by a security guard. The undersigned finds, however, that Plaintiff has failed to demonstrate a genuine issue of material fact as to whether the medical providers in this case were acting under the compulsion of the state.

Plaintiff points to his testimony that he was told he could not refuse treatment because he was in police custody:

Q        Who told you that, by the way, if you remember today?

A        They were in scrubs, and the police officers also – there was at least one police officer that said that. And they said that multiple times. They said, "You're in police custody, you can't refuse."

(Doc. 44, at 13) (Plaintiff Depo., Doc. 44, at 50); *see also* Exs. 2 & 4 to Tupa Depo., Doc. 43, at 46, 57.; Ex. 2 to Manuguerra Depo., Doc. 45, at 57 (notations regarding police custody). But these facts, even taken in the light most favorable to Plaintiff, do not transform the medical providers into state actors. At best, the facts show a medical provider (someone "in scrubs") and

a police officer, told Plaintiff he could not refuse medical treatment because he was in police custody. *Id.* But a medical provider and a police officer telling Plaintiff he could not refuse treatment does not show the police officers directed any decision of any medical providers about what treatment to provide. That is, Plaintiff has presented no evidence to support his contention that the police officers influenced the medical providers' medical decisions. Rather, as discussed further below, the testimony from the police officers shows they did not direct medical treatment. And the testimony from the medical providers shows they performed the urine and blood tests for medical, rather than law-enforcement, purposes.

Another district court in this circuit confronted a somewhat similar situation. *See Rudy v. Village of Sparta*, 990 F. Supp. 924 (W.D. Mich 1996). In *Rudy*, the plaintiff was arrested for driving under the influence. *Id.* at 926. The arresting officer eventually took the plaintiff to a hospital. *Id.* At the hospital, the plaintiff was asked to provide a urine sample but could not. *Id.* at 927. At some point the plaintiff became combative, and a doctor ordered a nurse to obtain a urine sample. *Id.* The doctor testified that such a sample was standard procedure when a patient is combative and is taken for purposes of determining if there are drugs in a patient's system. *Id.* He further testified "that plaintiff's urine was taken for medical reasons solely as the result of his considered medical opinion." *Id.* At this point:

> After waiting what seemed like a long time to plaintiff, a technician asked plaintiff for a urine sample. Plaintiff was unable to void. Nurse Sue Hoefflinger (now Hotchkiss) subsequently told Dr. McNinch that if he required a urine sample from plaintiff, she would "put in a Foley," or in layman's terms, catheterize plaintiff. According to Nurse Hoefflinger, Dr. McNinch then verbally ordered her to perform the catheterization. No written order concerning the catheterization was ever signed by Dr. McNinch. Shortly thereafter, the hospital technician, Mike Swartzlander, returned to the room. By plaintiff's account, Swartzlander returned with "a bag with some tubing in it." When Swartzlander asked plaintiff if he was ready to make his urine sample, the plaintiff said "no." At this point, defendant Holmberg waved his search warrant at plaintiff. After plaintiff noted that the search warrant said nothing about urine, defendant Holmberg is alleged to have

grabbed plaintiff's right arm and instructed Swartzlander to "just do it." Swartzlander has testified, however, that he has only performed a catheterization on a person in police custody when ordered to do so by a doctor or a nurse. Plaintiff testified that Swartzlander then ripped plaintiff's pants and forcibly catheterized him.

*Id.* Under these circumstances, the district court held the physician was not a state actor for purposes of § 1983:

Although neither defendant is a state agency or a state employee, plaintiff claims that defendants Butterworth and McNinch were acting under the color of state law because they were acting as the agents of defendant Holmberg in following Holmberg's order to catheterize plaintiff. As a result, plaintiff claims that defendants should be held liable for acting under the color of state law under either the "state compulsion test" or the "nexus test." Both tests are methods of determining whether private conduct is attributable to the state. *See Ellison v. Garbarino,* 48 F.3d at 195.

This Court holds that defendants Butterworth Hospital and Dr. McNinch were not state actors and were therefore not acting under color of state law in catheterizing plaintiff. Under the state compulsion test, a plaintiff must prove "that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state." *Ellison,* 48 F.3d at 195. Dr. McNinch testified that he ordered a urine sample for medical reasons based upon his own judgment. (McNinch Dep. at 28.) Dr. McNinch also testified that the idea of the catheter was brought to him by Nurse Hoefflinger, not defendant Holmberg. (McNinch Dep. at 41.) The uncontroverted evidence indicates that defendant Holmberg simply assisted in the catheterization after it had already been ordered by Dr. McNinch. As noted by defendants, the Supreme Court has held that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives...." *Blum v. Yaretsky,* 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982).

*Id.* at 930-31. The Court found: "At most, defendant Holmberg's instruction to 'just do it,' represents a mere scintilla of evidence that he ordered the catheterization, which is not enough to defeat a motion for summary judgment." *Id.* at 929.

Similarly here, Plaintiff has provided no evidence "that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action". *Ellison*, 48 F.3d. at 195. Rather, both the officers and the medical providers testified to the

opposite; that is, the officers testified they did not instruct any medical provider to take any particular action, and the medical providers testified they performed the tests they did for medical purposes. *See* Dumond Depo, Doc. 47, at 35; Peters Depo., Doc. 46, at 49; Manuguerra Depo., Doc. 45, at 60-63, 105-06; Tupa Affidavit, Doc. 55-1, at 2; Tupa Depo., Doc. 43, at 29-30, 95-96). The fact that Plaintiff was in custody does not change this analysis because Plaintiff has provided no evidence that his custodial status affected the decisions of the treatment providers. Plaintiff offers nothing more than speculation to support his contention that the medical providers were working under the compulsion of, or in conjunction with, the police officers. And speculation is not sufficient to defeat summary judgment. *See Jennings v. Cty. Of Monroe*, 630 F. App'x 547, 555 (6th Cir. 2015) (citing *Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 894 (6th Cir. 2003)).

Plaintiff has provided no evidence that the medical providers ordered specific testing, or the insertion of the catheter, "because they felt the coercive will of the State bearing upon them. They did so because medical standards of care prompted their use." *Thomas v. Nationwide Children's Hosp.*, -- F.3d --, 2018 WL 844672, at *3 (6th Cir.).[3] As such, the Defendant medical providers are entitled to summary judgment on Plaintiff's 42 U.S.C. § 1983 Fourth Amendment claim.

*Fourteenth Amendment – Privacy Claim*

Plaintiff next argues the medical providers were also state actors for purposes of his privacy claim. He seems to argue that, in responding to a subpoena he contends was overbroad

---

3. The undersigned also notes a contradiction in Plaintiff's arguments. Although he argues at one point that the medical providers were acting on behalf of the police officers, in his privacy argument, he contends that in turning over his records, FRMC "published the fact that Mr. Gold was drugged and catheterized against his will to the Sandusky Police." (Doc. 69, at 52). If the police officers were directing treatment, there would be nothing to publish.

under Ohio law, the medical providers became state actors and violated his Constitutional right to privacy. But the state action in this instance is the subpoena—which carried with it penalties for noncompliance. Responding to the subpoena did not transform the medical provider Defendants into state actors.

Therefore, having found Plaintiff has not shown they were state actors, the undersigned finds the medical provider Defendants (Firelands Regional Medical Center, Nurse Manuguerra, ER Doc., Inc., and Dr. Tupa) are entitled to summary judgment on Plaintiff's § 1983 claims.[4]

### Sandusky Police

In his Complaint, Plaintiff also alleges the police officers involved violated his Fourth, Fifth, and Fourteenth Amendment rights. The Defendant Officers assert they are shielded from liability by qualified immunity. Further, they contend that any due-process claims under the Fifth and Fourteenth Amendments fail because: 1) the Fifth Amendment due-process clause only applies to federal government action; and 2) Fourteenth Amendment substantive due-process is not to be used as a fallback when another amendment directly addresses the subject at issue.

"Qualified immunity shields government officials from civil liability in the performance of discretionary functions so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Fettes v. Hendershot*, 375 F. App'x 528, 531 (6th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Further, qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

For a constitutional right to be "clearly established," the

---

4. Plaintiff's sub-argument that the medical providers committed violations of state law, as discussed further below, the undersigned dismisses such claims without prejudice.

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

To determine whether a constitutional right is clearly established, a court, "must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth Circuit], and finally to decisions of other circuits." *Baker v. City of Hamilton,* 471 F.3d 601, 606 (6th Cir. 2006) (citations omitted).

To be sure, those decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting. *Durham v. Nu'Man,* 97 F.3d 862, 866 (6th Cir. 1996) (citation and quotation omitted). Especially where there is no declarative Supreme Court precedent, lower courts must have defined the contours of the constitutional right at issue with sufficient certainty and clarity that it "would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Sixth Circuit has explained: "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Rudlaff v. Gillespie*, 791 F.3d 638, 644 (6th Cir. 2015) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). When determining whether a particular law or right is "clearly established", courts should not define it at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks and citation omitted). "The clearly established law must be 'particularized' to the facts of the case." *Id.*

A plaintiff bears the burden of showing defendants are not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). Once an officer raises qualified immunity, the plaintiff must prove: (1) the officer's conduct violated a constitutional right; *and* (2) the right was "clearly established to the extent that a reasonable person in the officer's position would know the conduct complained of was unlawful." *O'Malley v. City of Flint*, 652 F.3d 662, 667 (6th Cir. 2011) (citing *Saucier*, 533 U.S. at 201). Courts may exercise discretion in deciding which of these two prongs should be addressed first in light of the circumstances at issue. *Pearson*, 555 U.S. at 236.

*Fourth Amendment – Catheterization*

To the extent Plaintiff argues the officers violated his Fourth Amendment rights in the insertion of the catheter or in taking his blood, such a claim fails for the reasons stated above. That is, there is no evidence the catheter was placed, or blood drawn, at the request of the police. Rather, it was medical personnel who made the decision and performed the action. *See* Dumond Depo, Doc. 47, at 35; Peters Depo., Doc. 46, at 49; Manuguerra Depo., Doc. 45, at 60-63, 105-06; Tupa Affidavit, Doc. 55-1, at 2; Tupa Depo., Doc. 43, at 29-30, 95-96). As such, Plaintiff cannot show a constitutional violation by the officers in this regard. *See Rudy*, 990 F. Supp. at 929 ("When viewed as a whole, however, the evidence clearly indicates that the procedure itself, and therefore the alleged violation of plaintiff's rights, was *caused* solely by Dr. McNinch's decision to order the catheterization, and [the hospital technician's] decision to follow this order . . . In short, all of the testimony indicates that [the defendant police officer] did not cause the catheterization to take place . . . Thus, to the extent plaintiff attempts to subject [the defendant police officer] to civil liability under § 1983 for the forced catheterization, plaintiff's claims must be dismissed."); *Meyer v. Woodward*, 617 F. Supp. 2d 554, 564 (E.D. Mich. 2008) (granting

qualified immunity on forced catheterization claim where the plaintiff was in custody, but "[i]t [was] undisputed that [a physician] ordered the catheterization because he had determined that it was medically necessary. It is also undisputed that the catheterization was not ordered for an evidentiary purpose, or as part of a criminal investigation. [The defendant police officer] did not order the catheterization or insert the catheter."). Here, the causal agents were the medical providers, not the police. As such, this claim fails.

<em>Fourth Amendment – Subpoena of Records</em>

Plaintiff next alleges the officers violated his Constitutional rights when they obtained his medical records with a subpoena, rather than a warrant.

The undersigned turns first to Plaintiff's Fourth Amendment claim, because it provides the more "explicit textual source of constitutional protection" against law enforcement searches. *Cty. Of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). Here, the undersigned finds Plaintiff has not shown a violation of "clearly established" Fourth Amendment law. Although the parties frame the issue in part as what was clearly established by *Ohio* law at the time, the proper question is to "look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth Circuit], and finally to decisions of other circuits." *Baker,* 471 F.3d at 606; *see also Davis v. Scherer,* 468 U.S. 183, 193–96 (1984) (holding that qualified immunity is not defeated if an official's conduct violates clearly established state law but not clearly established federal rights; "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").

Plaintiff (quoting from an Ohio state case) appears to rely on *Missouri v. McNeely*, 569 U.S. 141 (2013). *McNeely*, however, is not on point here. In that case, the Supreme Court held

that "the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify a blood test without a warrant." *Id.* at 165. In *McNeely*, a police officer stopped a driving suspect, and observed the driver appeared intoxicated. *Id.* at 145. Both before and after his arrest, the suspect refused a breath test. *Id.* at 145-46. The officer then transported the suspect to the hospital and directed the hospital to draw a blood sample (without first obtaining a warrant). *Id.* Thus, *McNeely* stands for the proposition that an officer may not *direct and obtain* a non-consensual blood test in a drunk-driving investigation based on an exigency exception to the Fourth Amendment warrant requirement. It does not, however, hold that a search warrant is required to obtain medical records showing the presence of alcohol in a suspect's system, particularly where, as here, those tests were performed for medical, rather than investigative purposes. Thus, the undersigned concludes *McNeely* does not provide the officers in this situation, in obtaining records through a subpoena, acted objectively unreasonably.

Further indicating the necessity of using a warrant to obtain medical records is not "clearly established", at least one circuit court has held the opposite. *See Kerns v. Bader*, 663 F.3d 1173, 1185-87 (10th Cir. 2011). In *Kerns*, the plaintiff argued "he had a constitutionally protected expectation that the hospital would keep its records shielded from the Sheriff absent a warrant." *Id.* at 1183. In that case, the Sheriff asked a VA hospital (where Plaintiff had received treatment) for the records, and the hospital provided them voluntarily. *Id.* at 1179. In holding Fourth Amendment law was not so clearly established as to require a warrant in such a case, the *Kerns* court explained:

> Complicating the Fourth Amendment analysis in this case is the role of third party doctrine. Under that doctrine, "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to Government authorities, even if the information is revealed [to the third party] on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller,*

425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The Supreme Court has already applied third party doctrine to financial information, holding that the government may seek without a warrant confidential information clients have entrusted to their banks for safe keeping. *Id.* And at least some courts have indicated the same analysis applies to personal medical records entrusted by patients to hospitals or care providers—allowing law enforcement to seek without a warrant medical records held by third parties. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.7(d) (4th ed. 2004) (collecting authority). While there's certainly room to debate whether and how third party doctrine should apply to medical records, *see, e.g.,* Poornima L. Ravishankar, Comment, *Planned Parenthood is Not a Bank: Closing the Clinic Doors to the Fourth Amendment Third Party Doctrine,* 34 Seton Hall L.Rev. 1093 (2004); *United States v. Warshak,* 631 F.3d 266 (6th Cir. 2010) (declining to extend *Miller* to ISP records), and while we in no way prejudge these questions, the fact that a live (and heated) debate exists on them is more than enough to preclude us from saying that the Sheriff violated clearly established law when he sought records held by a third party care provider.

In an effort to shoulder his burden of showing otherwise, Mr. Kerns depends principally on Ferguson v. City of Charleston, 532 U.S. 67, 121 S. Ct. 1281, 149 L.Ed.2d 205. But in that case the Supreme Court expressly declined to answer the question posed in this one. *Ferguson* held that state hospital employees conducted an unlawful search in violation of the Fourth Amendment by taking urine samples from pregnant mothers without their consent in order to test them for cocaine and provide the results to law enforcement for use against the patients. *Id.* at 77, 84–85, 121 S.Ct. 1281. In reaching its result, the Court took care to emphasize that the *only* search at issue was the taking and testing of urine for police use. *See id.* at 78 n. 13, 121 S.Ct. 1281. The Court expressly *left open* whether disclosure of preexisting medical records held by the hospital would also be a search implicating the Fourth Amendment. *Id.* at 77 n. 9, 121 S.Ct. 1281. In fact, the Court even acknowledged that in some situations a patient might well "expect that members of the hospital staff might turn over evidence" without his or her consent. *Id.* at 78 n. 13, 121 S.Ct. 1281. And after the Supreme Court remanded the case to the Fourth Circuit, that court, too, held only that the hospital's nonconsensual "taking and testing" of urine for law enforcement purposes was an unlawful search, and again expressly declined to decide "whether the disclosure of test results to law enforcement also implicate[s] the Fourth Amendment." 308 F.3d 380, 395 (4th Cir.2002). According to the terms of *Ferguson* itself, then, it hardly placed the Fourth Amendment question before us beyond debate. Underscoring our conclusion, Professor LaFave has explained that *Ferguson* cannot be taken as having "disapprov[ed] of the result in cases" applying third party doctrine to medical records and finding no Fourth Amendment violation where (as here) a law enforcement officer seeks medical records held by third party care givers. LaFave, *Search and Seizure* § 2.7(d).

*Kerns*, 663 F.3d at 1185; *see also Jones v. Woods*, 2015 WL 7281631, at *3 (D. Utah) (relying on *Kerns* and holding it was not clearly established for purposes of § 1983 that the Fourth Amendment required a warrant to obtain medical records).

Therefore, as the defendant officers have raised qualified immunity, and Plaintiff has not satisfied his burden, *Untalan*, 430 F.3d at 314, to show Fourth Amendment law was so "clearly established to the extent that a reasonable person in the officer's position would know the conduct complained of was unlawful." *O'Malley*, 652 F.3d at 667, the undersigned grants summary judgment on the basis of qualified immunity to the defendant officers on the § 1983 claims.

*Substantive Due Process*

To the extent Plaintiff asserts a substantive due process privacy claim, the undersigned notes the Supreme Court has been "reluctant to expand the concept of substantive due process . . . where a particular Amendment [like the Fourth here] provides an explicit textual source of constitutional protection." *Lewis*, 523 U.S. at 841 (internal citation omitted).

Further, the Sixth Circuit has construed the right to information privacy narrowly. "The Sixth Circuit . . . has developed and applied a different approach to assessing informational privacy claims" that "requires that the asserted privacy interest implicate a fundamental right." *Lambert v. Hartman,* 517 F.3d 433, 442 (6th Cir. 2008); *see also Wilson v. Collins*, 517 F.3d 421, 429 (6th Cir. 2009) ("[T]he Sixth Circuit has held that the Constitution does not encompass a general right to nondisclosure of private information. Instead, the Sixth Circuit has continued to restrict the right of privacy to those rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.'"). In *Lee v. City of Columbus, Ohio*, the Sixth Circuit surveyed its prior case law regarding a privacy interest in medical records:

With regard to the dissemination of medical information, we have acknowledged that "a person possesses no reasonable expectation that his medical history will remain *completely* confidential[;] [t]his is not to say that a person has no interest in protecting, to some extent, the confidentiality of his medical records." *In re Zuniga,* 714 F.2d 632, 641 (6th Cir.1983) (citing *Whalen,* 429 U.S. at 606–07, 97 S.Ct. 869). However, under our interpretation of privacy rights, we have not yet confronted circumstances involving the disclosure of medical records that, in our view, are tantamount to the breach of a "fundamental liberty interest" under the Constitution. *See, e.g., Summe v. Kenton Cnty. Clerk's Office,* 604 F.3d 257, 270–71 (6th Cir.2010) (county's release of medical record of deputy county clerk to citizen pursuant to open records request did not implicate a right fundamental or implicit in the concept of ordered liberty so as to violate constitutional right to privacy); *Wilson,* 517 F.3d at 428–29 (state prisoner who brought a § 1983 action did not have a fundamental privacy interest in the information contained in his DNA profile retained in state and national DNA-indexing systems); *Jarvis v. Wellman,* 52 F.3d 125, 126 (6th Cir.1995) (disclosure of rape victim's medical records to an inmate by prison officials "does not rise to the level of a breach of a right recognized as 'fundamental' under the Constitution" so as to state cognizable § 1983 action); *In re Zuniga,* 714 F.2d at 642 (affirming the enforcement of a subpoena duces tecum issued by a grand jury, commanding psychotherapists to produce patient information); *Gutierrez v. Lynch,* 826 F.2d 1534, 1539 (6th Cir.1987) (city ordinance that required employees on sick leave for more than thirty days to complete a form providing the City with medical information was legitimate request and did not invade former employee's right to privacy); *Gen. Motors Corp. v. Dir. of Nat'l Inst. for Occupational Safety,* 636 F.2d 163, 165–66 (6th Cir.1980) (enforcement of a subpoena issued by the National Institute for Occupational Safety and Health for the production of medical records of automaker's employees, in conjunction with research on workplace health hazards, did not intrude upon protected privacy interests, where safeguards against the improper disclosure of the confidential information could be implemented).

636 F.3d 245, 260–61 (6th Cir. 2011). And, the Sixth Circuit has identified an informational-privacy interest of constitutional dimension only in very limited circumstances: 1) where the release of personal information could lead to bodily harm, *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998) (disclosure of undercover officers' personal information to defense counsel for alleged drug conspirators violated privacy rights because it "created a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives"); and 2) where the information released was of a sexual, personal, and humiliating nature, *Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir. 1998) (disclosure of "highly

personal and extremely humiliating details of a rape" violated privacy rights). *See Kenny v. Bartman*, 2017 WL 3613601, at *6 (6th Cir.) (repeating that the Sixth Circuit has recognized a constitutionally-protected informational-privacy interest in only these two circumstances). Petitioner has not shown (and indeed has not argued) that the alleged violation here fits into either of these two categories. Therefore, the undersigned concludes Plaintiff cannot show a clearly established substantive due process violation arising from the release of his hospital treatment records to law enforcement in response to a subpoena.

### *City of Sandusky* – **Monell** *Claim*

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs of City of New York*, 436 U.S. 658, 691 (1978) (emphasis in original); *DePiero v. City of Macedonia*, 180 F.3d 770, 786 (6th Cir. 1999). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694; *see also Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998) ("In other words, a municipality can be liable under § 1983 only where its policies are 'the moving force' behind the constitutional violation.") (quoting *Monell*, 436 U.S. at 694) . That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a causal link between the municipal action and the deprivation of federal rights. *Bd. Of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

When damage is inflicted by police officers, a city can also be held liable for failure to train its employees. *Sova*, 142 F.3d at 904. In order to succeed on a failure to train claim, a

plaintiff must establish: "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

Defendants argue: "Gold cannot establish any constitutional violations occurred. Moreover, there is no evidence that any Sandusky policy was the moving force that allegedly caused his claimed constitutional violations." (Doc. 58, at 25). Plaintiff asserts issues of fact remain on municipal liability, arguing:

> Defendant is simply incorrect to say that there is no demonstration of deliberate indifference to Plaintiff's interests in medical confidentiality shown in the evidence.
>
> * * *
>
> [D]uring the depositions of Chief Orzech, Assistant Chief Frost, and Officer Peters, none of these witnesses exhibited any animus toward the Plaintiff. They testified candidly and professionally. But it is equally clear that none of them recognized that their subpoenas of "any and all" records are not authorized by the Ohio statute. They were simply unaware of the issue. And although they all readily conceded that SPD policies are in place to protect suspect's rights, and that ongoing training is necessary for police officers to keep up with the law, they can not be expected to change such a long standing practice when none of them identified any Constitutional issue.

(Doc. 56, at 55-57). Moreover, Plaintiff quotes *Harvey v. Campbell Cty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011): "[f]or liability to attach in the instance of a single violation, the record must show 'a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *See* Doc. 56, at 57.

Plaintiff thus presents a "failure to train" *Monell* claim.[5] That is, he contends the Sandusky Police Department failed to adequately train their officers in how to obtain medical records, and as a result, he suffered a constitutional injury.

Again, municipalities are liable for a failure to train when the failure amounts to a deliberate indifference to the rights of persons with whom its officers come into contact. *Harris*, 489 U.S. at 388. "But a municipality cannot be deliberately indifferent for failing to train officers to avoid constitutional violations that have not been clearly established as such." *Sumpter v. Wayne Cty.*, 868 F.3d 473, 490 (6th Cir. 2017) (citing *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012); *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 995 (6th Cir. 2017)). Having above found the constitutional rights asserted not clearly established, the undersigned finds the City of Sandusky is also entitled to summary judgment on this claim[6].

State Law Claims

Plaintiff's original complaint asserted both federal and state law claims. "The district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Blakely v. United States,* 276 F.3d 853, 861 (6th Cir. 2002) (quoting 28 U.S.C. § 1367(a)). When, however, the district judge dismisses all claims over which it had original jurisdiction, the district court may decline to exercise supplemental jurisdiction over the remaining state-law claims. *Id.* at 862; *see also* § 1367(c). In

---

5. The undersigned notes that arguments not raised in response to summary judgment are waived. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008).
6. And, the undersigned notes, Plaintiff's argument that the subpoenas did not comply with the Ohio statute does not address the question here. That is, to succeed on his municipal liability claim, Plaintiff must show the city's failure to train was the moving force behind a *constitutional* violation. *See Monell*, 436 U.S. at 691.

deciding whether to exercise supplemental jurisdiction, the court should consider "'judicial economy, convenience, fairness, and comity.'" *Musson Theatrical, Inc. v. Fed. Express Corp.,* 89 F.3d 1244, 1254 (6th Cir.1996) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). When, as here, the court dismisses all federal claims before trial, the court should generally deny jurisdiction over the state-law claims. *See Robert N. Clemens Trust v. Morgan Stanley DW, Inc.,* 485 F.3d 840, 853 (6th Cir.2007); *see also Jackson v. Washtenaw Cty.*, 678 F. App'x 302, 309 (6th Cir. 2017) ("Given Defendants' entitlement to qualified immunity on the § 1983 claims, the district court did not err in declining to exercise jurisdiction over the supplemental state-law claims."). Accordingly, the undersigned dismisses without prejudice Plaintiff's remaining state law claims for medical negligence, battery, and invasion of privacy.

Additional Motions

Also pending before the Court are FRMC and Manuguerra's Motion to Compel Production (Doc. 41), and Plaintiff's Motion to Strike Notice of Filing Admissions. (Doc. 65). Because the Motion to Compel Production addresses issues related to Plaintiff's state law claims, which the undersigned dismisses, that motion (Doc. 41) is denied as moot. And, because Defendants ER Doc, Inc. and Dr. Tupa do not oppose Plaintiff's Motion to Strike, *see* Doc. 67, that motion is granted (Doc. 65).

**CONCLUSION**

Following review, and for the reasons discussed above, the undersigned GRANTS Defendants' motions for summary judgment (Docs. 40, 54-55, 58) as to Plaintiff's federal claims, and DISMISSES without prejudice Plaintiff's remaining state-law claims.

IT IS SO ORDERED.

 s/James R. Knepp II
United States Magistrate Judge